# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| FERRELLGAS PARTNERS L.P. *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) C.A. No. N19C-05-275 MMJ [CCLD] |
| v. | ) |
| | ) |
| ZURICH AMERICAN INSURANCE | ) |
| COMPANY and BEAZLEY | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendants. | ) |

Submitted: November 13, 2019
Decided: January 21, 2020

On Plaintiffs' Motion for Partial Summary Judgment AND
Defendant Zurich American Insurance Company's
Motion for Summary Judgment AND
Defendant Beazley Insurance Company's
Motion for Summary Judgment

## OPINION

Brenton W. Vincent, Esq. (Argued), Steven G. Trubac, Esq., Bryan Cave Leighton Paisner LLP, Chicago, Illinois, David J. Baldwin, Esq., Carla M. Jones, Esq., Tracey E. Timlin, Esq., Potter Anderson & Corroon LLP, Wilmington, Delaware, *Attorneys for Plaintiffs Ferrelgas, et al.*

Louis A. Bove, Esq., (Argued), Bodell Bove, LLC, Philadelphia, Pennsylvania, Bruce W. McCullough, Esq., Bodell Bove, LLC, Wilmington, Delaware, *Attorneys for Defendant Zurich American*

Neel Lane, Esq. (Argued), Norton Rose Fulbright US LLP, San Antonio, Texas, Samantha Miller, Esq., Norton Rose Fulbright US LLP, Washington, D.C., Thomas G. Macauley, Esq., Wilmington, Delaware, *Attorneys for Defendant Beazley Insurance Company*

**JOHNSTON, J.**

1

## FACTUAL AND PROCEDURAL CONTEXT

Plaintiffs filed this coverage action seeking declaratory relief for advancement of defense costs pursuant to insurance policies each defendant issued.[1] Plaintiffs are Ferrellgas Partners L.P. ("FGP"), Ferrellgas, L.P. ("FG"), Bridger Logistics, LLC, Bridger Administrative Services II, LLC, Bridger Lake, LLC, Bridger Leasing, LLC, Bridger Marine, LLC, Bridger Rails Shipping, LLC, Bridger Real Property, LLC, Bridger Storage, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, Bridger Swan Ranch, LLC, Bridger Energy, LLC, J.J. Addison Partners, LLC, and J.J. Liberty, LLC (collectively, "Plaintiffs"). Defendants are Zurich American Insurance Company ("Zurich") and Beazley Insurance Company ("Beazley").

On February 13, 2013, Eddystone Rail Company, LLC ("Eddystone") and Bridger Transfer Services, LLC ("BTS") executed a Rail Facilities Services Agreement ("RSA").[2] Eddystone alleged that it entered into the RSA with BTS based on representations made by its parent company, Bridger Logistics, and BTS officers Julio Rios and Jeremy Gamboa.[3] Eddystone alleged that Bridger

---

[1] FGP's First Am. Compl. at 23–30.
[2] Eddystone's First Am. Compl. (the "FAC") ¶ 36.
[3] *Id.* ¶¶ 42–45.

2

Logistics, Rios and Gamboa falsely represented that BTS was an independent, bona fide company with substantial operations and capital.[4]

The RSA provided that Eddystone would construct and operate a Facility in Eddystone, Pennsylvania ("Facility").[5] The purpose of the Facility was to transfer crude oil from railcars to river barges.[6] In exchange, BTS agreed to bring a minimum of 64,750 barrels of crude oil to the Facility every day from the time Eddystone completed the Facility until June 2019.[7] BTS agreed that if it failed to deliver, it would make a deficiency payment to Eddystone of $1.75 per barrel below the minimum volume commitment.[8] Eddystone invested $170 million in the construction of the Facility.[9] Eddystone completed construction of the Facility in April 2014.[10]

On June 24, 2015, FGP acquired Bridger Logistics, BTS and the "Fraudulent Transfer Recipient Subsidiaries."[11] Rios and Gamboa then joined Ferrellgas Inc.,

---

[4] Id.
[5] Id. ¶ 35–37.
[6] Id. ¶ 35.
[7] Id. ¶ 38.
[8] Id. ¶ 37.
[9] Id. ¶ 38.
[10] Id.
[11] Id. ¶ 52. Eddystone names the following subsidiaries of Bridger Logistics as "Additional Fraudulent Transfer Recipient Subsidiaries": Bridger, LLC, Bridger Marketing, Bridger Logistics and its subsidiaries Bridger Administrative Services II, LLC, Bridger Marine, LLC, Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, Bridger Energy, LLC, Bridger Leasing, LLC, Bridger Lake, LLC, Bridger Administration, Bridger Management, J.J. Liberty, LLC, and J.J. Addison Partners, LLC. Id. ¶ 34.

the general partner of FG and FGP,[12] as its management team for Bridger Logistics.[13]

Through January 2016, Eddystone transloaded every trainload of crude oil that BTS and its affiliates brought to Eddystone. BTS "made the transloading capacity it obtained from Eddystone available to Bridger Logistics on a long-term, exclusive basis. Bridger Logistics delivered North Dakota crude oil to a refinery in Trainer, Pennsylvania.[14] Bridger Logistics provided funds to BTS so that BTS could pay Eddystone pursuant to the deficiency provisions in the RSA."[15]

Eddystone alleged that, beginning in May 2015, FGP, FG,[16] Rios and Gamboa developed a "plan" to "strip BTS of its assets so as to avoid payment to Eddystone for the anticipated deficiencies in the monthly minimum volume commitment under the RSA."[17] Eddystone alleged that between May 2015 and January 2016, Rios, Gamboa, Bridger Logistics, FGP and FG stripped BTS of assets, causing BTS to act as little more than a liability shield for other FGP and FG entities.[18] During this same period, BTS transferred away all of its real and personal property and valuable contracts to other FGP and FG subsidiaries,

---

[12] Plaintiffs' Op. Br. at 4 (Jul. 11, 2019).
[13] FAC ¶ 54.
[14] Id. ¶ 36.
[15] Id. ¶ 6.
[16] Eddystone refers to FGP and FG collectively as "FGP" in the FAC. Id. ¶ 4.
[17] Zurich's Op. Br. at 7 (Sep. 18, 2019).
[18] FAC ¶ 69.

including the Fraudulent Transfer Recipient Subsidiaries.[19] Also in January 2016, Rios, Gamboa, Bridger Logistics, and FGP caused BTS to forgive millions of dollars in accounts receivable that it was owed by other Bridger Logistics and FGP affiliates, including the Fraudulent Transfer Recipient Subsidiaries.[20]

Eddystone alleged that this process left BTS "without any valuable assets and ongoing businesses so that it served as a mere tool of Defendants through which they hoped to evade the RSA obligations without cost to the Defendants."[21]

Around January 2016, crude prices fell.[22] North Dakota crude became more expensive relative to Brent-priced crude because of the higher transportation costs.[23] As a result, the shipper that was purchasing the Bridger Logistics supply of North Dakota crude oil from the Trainer refinery became unable to pay the minimum amounts it owed to Bridger Logistics.[24] "If the shipper defaulted, Bridger Logistics would still have to pay its obligations to BTS for the reserved capacity of the Eddystone terminal, but would have to find a new destination for the crude oil."[25]

---

[19] *Id.* ¶¶ 65–68.
[20] *Id.*
[21] *Id.* ¶ 69.
[22] *Id.* ¶ 7 & 61.
[23] *Id.*
[24] *Id.*
[25] *Id.*

On February 1, 2016, BTS stopped delivering oil to the Facility, or paying Eddystone for the deficiencies in the minimum volume commitment, in breach of the RSA.[26] Eddystone filed a demand for arbitration and, on January 5, 2017, secured an award for unpaid invoices that had accrued to date and for future minimum volume payments.[27]

Eddystone filed its First Amended Complaint ("FAC") in the United States District Court for the Eastern District of Pennsylvania on September 9, 2018, seeking recovery of the arbitration award from FGP, FG, Rios and Gamboa, on theories of alter ego liability, intentional and constructive fraudulent transfer, and breach of the duty of care and loyalty to creditors.[28] Eddystone requested all payments owed to Eddystone under the RSA, all amounts awarded through arbitration, all expectation damages available to a party injured by breach of contract, an order undoing the alleged fraudulent transfers, compensatory damages, punitive damages, and interest.[29]

Plaintiffs sought coverage under the Zurich Policy for Bridger Logistics and the Fraudulent Transfer Recipients.[30] Rios and Gamboa submitted a demand for indemnification to FG pursuant to the Partnership Agreement.[31] FG accepted the

---

[26] Zurich's Op. Br. at 7; FAC ¶¶ 73–74.
[27] *Id.*; FAC ¶ 75.
[28] FAC at 20–27.
[29] *Id.* at 28.
[30] Plaintiffs' Op. Br. at 6–7.
[31] *Id.* Ex. 5–6.

demand under a full reservation of rights and is currently paying Rios and Gamboa's defense costs.[32] Plaintiffs sought coverage under the Beazley Policy for for indemnity of Rios and Gamboa. Both insurers denied coverage.

On July 1, 2019, Plaintiffs brought this coverage action against Zurich and Beazley seeking to enforce its insurance contracts and for advancement of defense costs in relation to the Eddystone Litigation. On July 11, 2019, Plaintiffs filed a Motion for Partial Summary Judgment, asking the Court to enter judgment in their favor on both Counts I and II, and to find as a matter of law that each insurer has a duty to advance defense costs covering certain defendants in the Eddystone Litigation.

On September 18, 2019, Zurich submitted an Answering Brief and Motion for Summary Judgment asking the Court to dismiss Count I on the grounds that Zurich has no duty to advance defense costs covering the Eddystone Litigation. On September 18, 2019, Beazley submitted its Answering Brief, and Motion for Summary Judgment asking the Court to dismiss Count II on the grounds that Beazley has no duty to advance defense costs covering the Eddystone Litigation. The parties submitted additional briefing, and the Court heard oral argument on November 13, 2019.

---

[32] *Id.* Ex. 7; Ruisinger Aff. ¶¶ 16–17.

## STANDARD OF REVIEW

### *Summary Judgment*

Summary judgment is granted only if the moving party establishes that there are no genuine issues of material fact in dispute and judgment may be granted as a matter of law.[33] All facts are viewed in a light most favorable to the non-moving party.[34] Summary judgment may not be granted if the record indicates that a material fact is in dispute, or if there is a need to clarify the application of law to the specific circumstances.[35] When the facts permit a reasonable person to draw only one inference, the question becomes one for decision as a matter of law.[36] If the non-moving party bears the burden of proof at trial, yet "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment may be granted against that party.[37]

### *Choice-of-Law*

All motions before the Court require insurance policy interpretation. Neither the Zurich Policy nor the Beazley Policy contains a choice-of-law provision. Absent such express direction, Delaware courts employ the "most significant

---

[33] Super. Ct. Civ. R. 56(c).
[34] *Burkhart v. Davies*, 602 A.2d 56, 58–59 (Del. 1991).
[35] Super. Ct. Civ. R. 56(c).
[36] *Wooten v. Kiger*, 226 A.2d 238, 239 (Del. 1967).
[37] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

relationship test" to determine what state's law applies.[38] This doctrine considers what jurisdiction bears the most significant relationship to the insurance coverage as a whole.[39]

Delaware courts avoid, where possible, a choice-of-law analysis if the result would be the same under the law of either of the competing jurisdictions.[40] It appears to the Court that there is no material or significant difference between the laws of Delaware and Texas with respect to this coverage action. The parties also concede that Texas and Delaware law on interpretation of insurance contracts provides for the same outcome on the relevant coverage issues.[41]

The Court also notes that Delaware court consistently have held that Delaware law applies to disputes over directors and officers liability ("D&O")

---

[38] *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *6 (Del. Super.); *see also Pfizer Inc. v. Arch Ins. Co.*, 2019 WL 3306043 (Del. Super.); *Travelers Indem. Co. v. CNH Indus. Am. LLC*, 2018 WL 3434562 (Del.); *Certain Underwriters at Lloyds, London v. Chemtura*, 160 A.3d 457 (Del. 2017).

[39] *IDT Corp.*, 2019 WL 413692, at *6.

[40] *Id.*

[41] The parties agree that choice of law analysis is unnecessary for the purposes of resolving the motions before the Court. *See* Zurich's Ans. Br. at 11 (Sep. 18, 2019) ("As regards to the limited issue presented by the instant cross-motions, the laws of Delaware and Texas are entirely consistent and lead to the same inescapable result.").

insurance coverage[42] where, as here, the insured companies are Delaware corporations.[43]

### Insurance Contract Interpretation

Insurance policies are contracts.[44] Interpretation of contracts is a question of law. The Court must give effect to the parties' mutual intent at the time of contracting.[45] The Court should interpret contract language as it "would be understood by any objective, reasonable third party."[46] Absent ambiguity, contract terms should be accorded their plain, ordinary meaning.[47] Ambiguity exists when the disputed term "is fairly or reasonably susceptible to more than one meaning."[48]

---

[42] *IDT Corp.*, 2019 WL 413692, at *6–7:

> When they must engage in the multifaceted "most significant relationship" test, Delaware courts recognize that for [D&O policies], the insured risk is the directors' and officers' 'honesty and fidelity' to the corporation. So, "the state of incorporation has the most significant relationship" [where] the policy is issued pursuant to Delaware law, and "Delaware's law ultimately determines whether a director or officer of a Delaware corporation" breaches his or her fiduciary duties. *Id.* (citing *Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*, 2010 WL 8250837, at *6 (Del. Super.) and 8 DEL. CODE ANN. § 145).

[43] Plaintiffs' Op. Br. at 14.
[44] *IDT*, 2019 WL 413692, at *7; *Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2018 WL 6266195, at *4 (Del. Super.); *see also Cont'l Ins. Co. v. Burr*, 706 A.2d 499, 500–01 (Del. 1998) ("[A]n insurance policy is a contract of adhesion...."); *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982) ("[A]n insurance policy is an adhesion contract....").
[45] *Id.* citing *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1212 (Del. 2018) ("Whether [a] contract's material terms are sufficiently defined is mostly, if not entirely, a question of law."); *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1263 (Del. 2017) ("The proper construction of any contract...is purely a question of law...."); *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 286 (Del. 2001).
[46] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014).
[47] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012); *see also Goggin*, 2018 WL 6266195, at *4; *IDT*, 2019 WL 413692, at *7.
[48] *Id.*

Insurance policies are also adhesion contracts, not generally the result of arms-length negotiation.[49] Thus, the rules of construction "differ from those applied to most other contracts."[50] Where policy language is ambiguous, the doctrine of *contra proferentem* requires the Court to interpret the policy in favor of the insured because the insurer drafted the policy.[51] The Court, pursuant to this doctrine, looks to "the reasonable expectations of the insured at the time when he entered the contract[.]"[52] The Court will *only* apply this doctrine where the policy is ambiguous.[53] When the policy language is "clear and unambiguous[,] a Delaware court will not destroy or twist the words under the guise of construing them" and each party "will be bound by its plain meaning."[54]

## ANALYSIS

### *Zurich Policy*

Zurich issues D&O insurance policies to entities organized under the laws of Delaware. Zurich issued Private Company Select Insurance Policy No. MPL 0083979-00 to Bridger LLC[55] (the "Zurich Policy").

---

[49] *Hallowell*, 443 A.2d at 926.
[50] *Id.*
[51] *Id.* (citing *Novellino v. Life Ins. Co. of North America*, 216 A.2d 420, 422 (Del. 1966); *Steigler v. Insurance Co. of North America*, 384 A.2d 398, 400 (Del. 1978)).
[52] *Id.* at 927.
[53] *Id.* at 926.
[54] *Id.*
[55] Prior to June 24, 2015, Bridger LLC was the parent of Bridger Logistics and its subsidiaries. It is now a now a defunct entity.

11

The Zurich Policy provides:

> The Underwriter shall pay on behalf of the **Company** all **Loss** for which the **Company** becomes legally obligated to pay on account of a **Claim** first made against the **Company** during the **Policy Period** or the **Extended Reporting Period** or **Run-Off Coverage Period**, if exercised, for a **Wrongful Act** taking place before or during the **Policy Period**, subject to the applicable Limits of Liability set forth in Items 2 and 6 of the Declarations.[56]

The Zurich Policy defines "Loss" as "the amount the 'Insureds' become legally obligated to pay on account of 'Claims' made against them for 'Wrongful Acts.'"[57] A "Claim" is any "civil proceeding against any Insured."[58]

Plaintiffs argue that the Zurich Policy covers the Eddystone Litigation because Plaintiffs have incurred reasonable expenses in relation to a civil proceeding—the Eddystone Litigation—arising from Wrongful Acts of the Insureds.[59]

The Zurich Policy defines "Wrongful Acts" as:

> [A]ny error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly committed or attempted by any of the Insured Persons, individually or otherwise, in their capacity as such...or with respect to Insuring Clause C, by the Company.[60]

---

[56] Jones Aff. Ex. 2, Zurich Policy, I.
[57] *Id.*, III.E.
[58] *Id.*, III.A.
[59] For purposes of this motion only, Zurich assumes that Bridger Logistics and BTS are Insureds under the Zurich Policy, but reserves the right to present argument and evidence to the contrary should the case survive these Cross-Motions. Zurich's Op. Br. at 11.
[60] Jones Aff. Ex. 2, Zurich Policy, III.J.

The FAC contains allegations that Plaintiffs made misleading statements as early as 2013, and committed breaches of duty as late as 2016.[61] Plaintiffs' claim against Zurich relies on the premise that the FAC presents a range of Wrongful Acts which are separable into two categories.[62] Plaintiffs refer to transfers of property and debt forgiveness that allegedly caused Eddystone's breach of contract as "Transfer Acts."[63] Plaintiffs designate the alleged misleading statements made to induce Eddystone into entering the RSA "Inducement Acts."[64] Zurich denied coverage on the grounds that it has no duty to advance defense costs because the Eddystone Litigation constitutes a single Claim arising solely from Wrongful Acts excluded pursuant to a Run-Off Exclusion.

*Run-Off Exclusion*

The Zurich Policy provides coverage for a policy period from December 17, 2014 to December 17, 2015.[65] Plaintiffs also purchased Run-Off Endorsement No. 42 (the "Run-Off Endorsement"), which extended claims made coverage until 2021. However, the Run-Off Endorsement excludes coverage for Claims arising from Wrongful Acts that occurred prior to June 24, 2015. The Run-Off Exclusion provides:

---

[61] FAC ¶¶ 42–45 & 65–68.
[62] Plaintiffs' First Am. Compl. at 16–22.
[63] *Id.*
[64] *Id.*
[65] Jones Aff., Ex. 2, Zurich Policy, Declarations at 1.

13

> The Underwriter shall not be liable for "Loss" on account of, and shall not be obligated to defend, any "Claim" made against any Insured based upon, arising out of, or attributable to any "Wrongful Acts" including any "Interrelated Wrongful Acts", taking place in whole or in part subsequent to 06/24/2015.[66]

Zurich argues that the Zurich Policy does not cover the Eddystone Litigation because it arose solely from the Transfer Acts, which began after June 24, 2015 (the "Extended Claims Period").[67] According to the FAC, the RSA breach occurred in February 2016, and the bulk of the Transfer Acts related to the breach occurred in or around January 2016, months after the expiration of the Extended Claims Period.

Plaintiffs posit that, even if the Transfer Acts are excluded, the Inducement Acts all occurred between December 17, 2014 and June 24, 2015, and are therefore covered by the Zurich Policy. Zurich argues that the Inducement Acts cannot escape the Run-Off Provision because: (1) they do not constitute a Claim at all, and are therefore excluded; or (2) they constitute Interrelated Wrongful Acts related to the excluded breach of contract Claim.

*Claims*

The Eddystone FAC, as Plaintiffs interpret it, raises multiple "Claims" arising from either the Transfer Acts or Inducement Acts. Zurich, on the other

---

[66] *Id.* at Run-Off Endorsement # 42.
[67] FAC ¶¶ 65–68.

14

hand, construes the FAC as one single breach of contract "Claim" arising from the RSA breach.

If the Inducement Acts constitute a separate Claim independent of the Transfer Acts, coverage might not be excluded by the Run-Off Exclusion. Thus, the Court must determine whether the Eddystone Litigation constitutes one Claim arising from the RSA breach or if it establishes other Claims that would trigger Zurich's duty to advance defense costs.

The four "Counts" listed in the FAC are: (I) Alter Ego; (II) Intentional Fraudulent Transfer; (III) Constructive Fraudulent Transfer; and (IV) Breaches of Fiduciary Duties owed to Creditors.[68]

Zurich interprets these Counts as tools to enforce the RSA following the breach as opposed to attempts to avoid the RSA following fraudulent inducement. Through this lens, FAC Count II seeks to reverse the transfers that caused BTS to breach,[69] and FAC Count III attempts to create a fund from which Eddystone may recover for the breach.[70]

Zurich also uses Eddystone's requested relief to support its contention. In the FAC, Eddystone requested:

(1) all payments BTS owes Eddystone pursuant to the RSA;

---

[68] FAC at 20–28.
[69] *Id.* ¶¶ 76–86.
[70] *Id.* ¶¶ 87–93.

15

(2) the amounts owed pursuant to the arbitration award;

(3) expectation damages available to a party injured by breach of contract at common law or by statute;

(4) injunctive relief from transfers BTS made to the Fraudulent Transfer Recipient Subsidiaries;

(5) damages for the value of the transfers;

(6) compensatory damages for economic injury;

(7) punitive damages for intentional fraudulent transfer and willful breach of fiduciary duty; and

(8) any pre- and post-judgment interest.[71]

Zurich contends that none of these requests for relief seek an award based on fraudulent inducement. All of Eddystone's requests for relief arise from damages allegedly caused by the RSA breach.[72] In fact, Eddystone specifically demanded enforcement of the arbitration award or, in the alternative, the equivalent of the award in consequential damages arising out of the RSA breach.

Zurich also considers FAC Counts I and IV (Alter Ego and Breaches of Fiduciary Duties) as Eddystone's attempt to impose liability on FGP, Bridger Logistics, Rios, Gamboa, and Bridger Rail Shipping for BTS' breach of the RSA.[73] Zurich suggests that "[i]n the absence of the RSA and, more importantly, the breach of the RSA in February of 2016, no cause of action would lie."[74] Thus,

---

[71] *Id.* at 27–28.
[72] *Id.*
[73] *Id.* ¶¶ 94–98 & 99–103.
[74] Zurich's Ans. Br. at 16 (Sep. 18, 2019).

16

Zurich argues that breach of the RSA is the foundation for each and every one of Eddystone's causes of action.

With regard to Plaintiffs' assertion that the Inducement Acts qualify as an independent Claim, Zurich contends that the Inducement Acts: (1) cannot be separated because they are merely "Interrelated Wrongful Acts"; and (2) do not, independent of the Transfer Acts, qualify as a Claim that triggers Zurich's duty to advance defense costs.

*(1) Interrelated Wrongful Acts*

The Run-Off Endorsement excludes, in addition to all Wrongful Acts outside the scope of the Zurich Policy, any and all Wrongful Acts which are interrelated to those excluded Wrongful Acts ("Interrelated Wrongful Acts"). The Zurich policy defines Interrelated Wrongful Acts as:

> [a]ll "Wrongful Acts" that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally connected facts, circumstances, situations, events, transactions or causes.[75]

Thus, Zurich argues, the Inducement Acts do not give rise to an independent Claim pursuant to the Zurich Policy because they share a common nexus of fact with the Transfer Acts. While the Inducement Acts allegations involve alleged misrepresentations which hid BTS' undercapitalization and lack of independence,

---

[75] Jones Aff., Ex. 2, Zurich Policy, Declarations at 1.

17

the Transfer Acts allegedly *resulted* in undercapitalization as a product of Plaintiffs' dominion and control over BTS. Accordingly, Zurich argues, the Eddystone Litigation only arises from the consequences of the Transfer Acts, not the Inducement Acts.

Plaintiffs respond that that the Inducement Acts and Transfer Acts are similar, but do not constitute Interrelated Wrongful Acts because they are not "fundamentally identical." Plaintiffs rely upon *Pfizer Inc. v. Arch Ins. Co.* [76]

In *Pfizer*, this Court applied the "fundamentally identical" interpretation to "arising out of" and "interrelated" language in a D&O insurance policy exclusion.[77] The *Pfizer* plaintiff asserted that the defendant insurers wrongfully denied D&O coverage for a securities fraud class action called the *Morabito* Action.[78] Defendants argued that the policies excluded coverage for the *Morabito* Action pursuant to the policy's Related Wrongful Acts and Specific Litigation exclusions.[79]

The Related Wrongful Acts provision in *Pfizer* excluded coverage for Wrongful Acts alleged in claims that had been reported, or for which notice had been given prior to the policy period.[80] The Specific Litigation provision excluded

---

[76] 2019 WL 3306043 (Del. Super.).
[77] *Id.* at *9–10.
[78] *Id.* at *1 & 3.
[79] *Id.* at *2–3.
[80] *Id.* at *2.

18

coverage for claims alleging Wrongful Acts which were related to the *Garber* Action—another securities fraud class action brought against Pharmacia, a company Pfizer had acquired.[81]

Defendants in *Pfizer* argued that both exclusions precluded coverage for the *Morabito* Action because it arose from "Interrelated Wrongful Acts" that shared a common nexus of fact with the Wrongful Acts in the *Garber* Action.[82] The issue before the Court was whether the *Morabito* Action shared "as a common nexus of any fact, circumstance, situation, event, transaction [or] cause" with the *Garber* Action.[83]

The Court found that the two actions did not cover the "same subject," and thus coverage was not precluded.[84] The Court pointed out a myriad of differences between the *Morabito* and *Garber* Actions. *Different* plaintiffs brought *separate* actions against *different* defendants regarding *different* misrepresentations about *different* products and associated health risks.[85]

The Court found that the Wrongful Acts alleged were not "fundamentally identical" despite sharing some characteristics.[86] Thus, the Court found as a matter

---

[81] *Id.*
[82] *Id.* at *3.
[83] *Id.* at *1.
[84] *Id.* at *10.
[85] *Id.*
[86] *Id.*

of law that the exclusions did not excuse defendants from coverage because the *Morabito* and *Garber* Actions were not fundamentally identical.[87]

Plaintiffs argue that Transfer Acts and Inducement Acts are not fundamentally identical. The Transfer Acts only include allegations that Plaintiffs acted to remove all value from BTS after the Facility was built.[88] Plaintiffs identify the Inducement Acts as the allegations that Rios, Gamboa, and BTS falsely represented that BTS was an independent company with substantial operations and assets,[89] which successfully induced Eddystone to enter into and remain bound by the RSA.

Plaintiffs contrast the Transfer Acts, which support the claim for breach of the RSA, and occurred largely in 2016, with the Inducement Acts, which would support a fraud claim for representations made prior to 2016. Plaintiffs also assert that the different acts resulted in different harms. The Inducement Acts resulted in Eddystone's commitment of millions of dollars into building the Facility, but the Transfer Acts resulted in expectation damages arising from the breach. Therefore,

---

[87] *Id.*

[88] These include causing BTS to wrongfully forfeit to Bridger LLC and FGP affiliates all of BTS' real and personal property and forgive millions of dollars in accounts receivable that Bridger LLC and FGP affiliates owed to BTS. FAC ¶¶ 65–68.

[89] These representations include that BTS had total assets of $98.1 million, including shareholder' (members') equity of $37.9 million, including crude oil truck injection units, construction in progress, and receivables; when in fact is was undercapitalized and dominated by Bridger Logistics. Plaintiffs' Op. Br. at 10.

Plaintiffs argue, the Inducement Acts and the Transfer Acts are not fundamentally identical and would not constitute Interrelated Wrongful Acts.

Zurich argues that, in the present case, there is only *one* suit involving the same class of defendants and the same actions, whereas in *Pfizer*, there were two separate actions against varying defendants brought by different plaintiffs.

### (2) Duty to Advance Defense Costs

Zurich argues that even if the Inducement Acts are not Interrelated Wrongful Acts, they do not trigger Zurich's duty to advance defense costs independent from the Transfer Acts. Zurich explains that "[t]he Zurich Policy covers Loss resulting from a Claim against Insureds for Wrongful Acts, not the Wrongful Acts themselves."[90] A Claim is a civil action arising from Wrongful Acts.[91] The Eddystone Litigation does not, on its face, assert a fraudulent inducement action. Thus, Zurich argues that the Inducement Acts are not the basis of any Claim, so the Inducement Acts do not activate Zurich's duty to advance defense costs.

Plaintiffs argue that the Court is not bound by the causes of action stated in the FAC. In *IDT Corp. v. U.S. Specialty Ins. Co.*, this Court held that: "[i]n determining whether the duty to defend and advance defense costs is triggered, the Court must examine whether the underlying complaint alleges *facts* that fall within

---

[90] Zurich's Op. Br. at 23 (internal quotations omitted).
[91] "Claim means…a civil proceeding against any **Insured** commenced by the service of a complaint or other similar pleading…." Jones Aff., Ex. 2, Zurich Policy, III.A.2.

the scope of coverage."[92] Thus, Plaintiffs argue, Zurich must advance defense costs because the FAC alleged facts—the Inducement Acts—that *would* fall within the scope of coverage.

Zurich insists that Plaintiffs misapply the duty to defend test to Zurich's duty to advance defense costs. In *Verizon Communications, Inc. v. Illinois National Insurance Co.*,[93] this Court distinguished the duty to defend and the duty to advance defense costs. While the duty to defend test asks whether the "factual allegations in the underlying complain potentially support a covered claim" the proper test for determining duty to advance defense costs is "whether an action states a *claim covered by the policy*."[94] Zurich argues that in the present case, the Inducement Acts did not implicate coverage because they were not pled as an independent Claim under this Delaware standard, because Claims are defined by the Zurich Policy.[95]

Plaintiffs disagree, noting that the Court is not bound by Eddystone's representation of the claims it raises. Plaintiffs argue that, despite the FAC's failure to specifically mention fraud in the inducement, FAC Count I, Alter Ego, is

---

[92] 2019 WL 413692, at *10 (emphasis added).

[93] 2017 WL 1149118, at *7 (Del. Super.), *rev'd on other grounds*, 2019 WL 5616263, at *10 (Del.).

[94] *Id.*, 2017 WL 1149118, at *6–7 (citing *Cont'l Cas. Co. v. Alexis I. DuPont Sch. Dist.*, 317 A.2d 101, 105 (Del. 1974)) (emphasis added) (internal quotations omitted).

[95] "Claim means…a civil proceeding against any **Insured** commenced by the service of a complaint or other similar pleading…." Jones Aff., Ex. 2, Zurich Policy, III.A.2.

intended to recover for the Inducement Acts from the parties who allegedly induced Eddystone to enter the RSA. Plaintiffs contend that the Alter Ego action suffices as a Claim arising out of, or attributable to fraud in the inducement based on the Inducement Acts.

The Court is not bound by either the causes of action or requests for relief set forth in the FAC.[96] The Court looks at the facts stated in the complaint as well as any causes of action, and may review the complaint as a whole and consider all reasonable inferences that may be drawn from the allegations therein.[97] The facts as Eddystone presents them in the FAC allege that Plaintiffs defrauded Eddystone. However, "the Court is not limited to [Eddystone]'s unilateral characterization of the nature of its claims."[98]

The Court "looks beyond"[99] Eddystones's *characterization* of its Claims, and examines the FAC as a whole to determine whether Eddystone pursued the Inducement Acts in a Claim, so as to trigger Zurich's duty to advance defense costs. Claim is unambiguously defined in the Zurich Policy as a civil proceeding against the Insured.[100] Eddystone's duty to advance defense costs is triggered by a Claim arising from Wrongful Acts that took place within the Policy Period or

---

[96] *IDT*, 2019 WL 413692, at *10.
[97] *Id.*
[98] *Id.* (citing *Verizon*, 2017 WL 1149118, at *6–7).
[99] *Id.*
[100] Jones Aff., Ex. 2, Zurich Policy, I & III.A.2.

23

Extended Claims Period.[101] The Wrongful Acts, absent a Claim causing Loss to the Insureds, do not trigger Zurich's duty to advance defense costs under any reasonable interpretation of the Zurich Policy.

Viewing the Eddystone FAC in the light most favorable to Plaintiffs, the Court finds that all Claims in the FAC stem from the February 16, 2016 breach of the RSA. All requested relief in the Eddystone FAC is in the nature of damages for breach of contract. Eddystone is not seeking reformation of the RSA or to set aside the RSA. The Court finds that the Eddystone Litigation does not raise a Claim for damages based on fraud in the inducement, the Inducement Acts, or any damages separate and apart from the breach of contract claim.

The Court finds that the Run-Off Exclusion clearly and unambiguously excludes coverage for Wrongful Acts outside the policy period and Extended Claims Period of December 17, 2014 to June 24, 2015.[102] The Court finds that the Run-Off Exclusion language is not fairly or reasonably susceptible to more than one meaning. Wrongful Acts are excluded which took place in whole or in part subsequent to June 24, 2015. The exclusion incorporates any Interrelated Wrongful Acts.

---

[101] *Id.*

[102] Jones Aff., Ex. 2, Zurich Policy, Declarations at 1.

24

The RSA breach and the causally-related Transfer Acts purportedly occurred between May of 2015 and January of 2016.[103] The alleged improper debt forgiveness happened in January 2016, immediately preceding the breach.[104]

Interrelated Wrongful Acts are those having a "common nexus of any fact, circumstance, situation, event, transaction, cause, or series of causally connected facts, circumstances, situations, events, transactions or causes."[105] The bulk of the Wrongful Acts leading to the breach, and the breach itself occurred well after the expiration of the Extended Claims Period.[106] Thus, the Wrongful Acts which gave rise to the Claims based on that breach took place predominantly subsequent to the coverage expiration. The Run-Off Exclusion denies coverage for any Interrelated Wrongful Acts "taking place in whole *or in part* subsequent to 06/24/2015."[107]

Therefore, the Court finds that the Run-Off exclusion applies to, and therefore excludes, coverage for Claims (the Transfer Acts) arising from the February 16, 2016 breach of the RSA, as sought in Eddystone's FAC. Eddystone did not pursue a Claim for the Inducement Acts. The Court finds that the Eddystone Litigation is excluded from coverage by the Zurich Policy. Therefore, Zurich's Motion for Summary Judgment is hereby **GRANTED.** Plaintiffs' Motion

---

[103] FAC ¶ 69.
[104] *Id.* ¶¶ 65–68.
[105] Jones Aff., Ex. 2, Zurich Policy, Declarations at 1.
[106] FAC ¶¶ 65–68.
[107] Jones Aff., Ex. 2, Zurich Policy, Declarations at 1 (emphasis added).

for Partial Summary Judgment on Count I, duty to advance defense costs, is hereby **DENIED,** and Count I is hereby **DISMISSED.**

### *Beazley Policy*

Defendant Beazley Insurance Company ("Beazley") issued Advanced Boardroom and Company Protection Policy No. V17E85160201 to FGP for the Policy Period from March 3, 2016 to March 3, 2017[108] (the "Beazley Policy"). The Beazley Policy provides coverage for "Loss which the Company is required or permitted or has agreed to pay as indemnification to any of the Insured Persons during the Policy Period for a Wrongful Act."[109]

The Company includes FGP (the Parent Company), any Subsidiary, and any entity expressly named in Endorsement No. 14 to the Beazley Policy.[110] The

---

[108] Jones Aff., Ex. 1, Beazley Policy, Declarations at 1.

[109] *Id.*, I.B; *see also Id.*, II. BB which defines "Wrongful Acts" as:

> [A]ny actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty…by any of the Insured Persons, while acting in their capacity as such, or any matter claimed against any of the Insured Persons solely by reason of their serving in such capacity…. *Id.*

The Beazley Policy also provides that "Interrelated Wrongful Acts" are:

> Wrongful Acts which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions. *Id.*, II.M.

[110] *Id.*, II.C & II.T; Declarations at 1; Endorsement 14, C.5.

26

Company is expressly defined to include Bridger Logistics.[111] The Insureds include the Company and the Insured Persons.[112] The Insured Persons include:

> 1. All persons who were, now are, or shall be directors, officers or risk managers of the Company and all persons serving in a functionally equivalent role for the Parent Company or any Subsidiary operating or incorporated outside the United States; [and]

> 2. All persons who were, now are, or shall be managers or functionally equivalent roles of any limited liability company as defined in Clause II.AA....[113]

FG is an Insured under the Beazley Policy.[114] Plaintiffs assert that Rios and Gamboa, as officers of both Bridger Logistics and Ferrellgas Inc., are Insured Persons. FG agreed, under a full reservation of rights, to indemnify Rios and Gamboa.[115] Plaintiffs argue that FG's indemnification of Rios and Gamboa for their alleged Wrongful Acts triggered Beazley's duty to advance defense costs.

---

[111] *Id.* Endorsement # 14, "Amended Company Definition."
[112] *Id.*, II.L.
[113] *Id.*, II.K.
[114] *Id.* Declarations at 1.
[115] Jones Aff. Ex. 7, Acceptance of Indemnification; Ruisinger Aff. ¶ 16.

*Duty to Advance Defense Costs*

Beazley's duty to advance defense costs is governed by the standard articulated in *Verizon*.[116] Only if the complaint, when read as a whole, asserts a risk within the coverage of the policy will Beazley's duty be triggered.[117]

Beazley argues that the FAC does not assert a risk within the coverage of the Beazley Policy because the Eddystone Litigation falls within the Retroactive Date Exclusion.

*Retroactive Date Exclusion*

The Beazley Policy provides the following "Retroactive Date Exclusion" for Scheduled Entities:

> This endorsement modifies insurance provided under the following:
> **ADVANCED BOARDROOM AND COMPANY PROTECTION**
>
> In consideration of the premium charged for this Policy, it is hereby understood and agreed that, solely with respect to Bridger Logistics, Clause **III. EXCLUSIONS** is amended by the addition of:
>
> based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:
>
> 1. any **Wrongful Act** actually or allegedly committed or any conduct actually or allegedly undertaken prior to 12:01 a.m. Local Time on 21-Jun-2015,

---

[116] *Verizon*, 2017 WL 1149118, at *6–7 (citing *Cont'l Cas. Co. v. Alexis I. DuPont Sch. Dist.*, 317 A.2d 101, 105 (Del. 1974)) (emphasis added) (internal quotations omitted).
[117] *Id.*

2. any other **Wrongful Act** occurring on or subsequent to the date stated in 1. above which, together with a **Wrongful Act** occurring prior to such date, would constitute **Interrelated Wrongful Acts**, or

3. any other conduct occurring on or subsequent to the date stated in 1. above which, together with conduct occurring prior to such date, have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.
All other terms and conditions of this Policy remain unchanged.[118]

Beazley denied coverage for the Eddystone Litigation on the grounds that it falls within this exclusion.[119] Beazley argues that, because the FAC alleges that Rios and Gamboa committed Wrongful Acts involving Bridger Logistics before June 21, 2015, the Retroactive Date Exclusion excludes coverage for the Eddystone Litigation.

Plaintiffs respond with two arguments: (1) the Wrongful Acts alleged do not fall within the excluded time; and (2) the Retroactive Date Exclusion does not apply to Rios and Gamboa under these circumstances.

*(1) Timing*

In its Motion, Beazley lists the activities that Rios and Gamboa allegedly committed, including: (1) falsely holding BTS out as an independent, bona fide company with substantial operations and assets;[120] (2) causing Bridger Group entities to enter into contracts with third parties to secure the necessary assets to

---

[118] Jones Aff., Ex. 1, Beazley Policy, Endorsement #16 at 1.
[119] *Id.* Ex. 10, Coverage Denial.
[120] FAC ¶ 42.

accomplish transport of crude oil, and providing funds needed to satisfy the deficiency payments;[121] and (3) stripping BTS of all assets, cash flows, and contracts.[122] Beazley argues that the Retroactive Date Exclusion excludes coverage for all these Wrongful Acts because they *commenced* before June 21, 2015.

Plaintiffs contend that, outside the Inducement Acts, Beazley cannot cite any specific conduct prior to June 21, 2015, and the specific Transfer Acts mentioned in the FAC took place in January 2016. Thus, the Retroactive Date Exclusion cannot capture the Eddystone Litigation.

Beazley responds that the Inducement Acts occurred prior to June 21, 2015, and even the Transfer Acts allegedly began before June 21, 2015. Beazley argues that, although many of the Wrongful Acts continued after June 21, 2015, they merely constitute Interrelated Wrongful Acts that share a common nexus of facts with the earlier Wrongful Acts.

### (2) Rios and Gamboa

The Retroactive Date Exclusion applies "*solely* with respect to Bridger Logistics."[123] Plaintiffs argue that Beazley misapplies the Retroactive Date Exclusion to Rios and Gamboa under these circumstances because Bridger

---

[121] *Id.* ¶ 47.
[122] *Id.* ¶¶ 55 & 88.
[123] Jones Aff., Ex. 1, Beazley Policy, Endorsement #16 at 1.

Logistics is not indemnifying Rios and Gamboa. Rios and Gamboa submitted a demand for indemnification to FG pursuant to the Partnership Agreement.[124] FG accepted the demand under a full reservation of rights and is currently paying Rios and Gamboa's defense costs.[125] Thus, Plaintiffs argue, the Retroactive Date Exclusion does not apply to the indemnification of Rios and Gamboa because FG—not Bridger Logistics—is indemnifying Rios and Gamboa in the instant suit against them in their capacity as FG officers.

According to Beazley, the Retroactive Date Exclusion is not limited to claims asserted by Bridger Logistics. Beazley argues that this provision clearly and unambiguously excludes FGP in the event FGP seeks any coverage related to the Bridger Logistics transaction. Beazley explains that the qualifying date in the Retroactive Date Exclusion, June 21, 2015, intentionally coincides with the June 24, 2015 acquisition date. Beazley suggests that Plaintiffs' understanding of the Retroactive Date Exclusion would render coverage of illusory because any Claim submitted "solely with respect to Bridger Logistics" after June 2015 would necessarily be submitted by FGP, as its parent.

Plaintiffs note that there is no mention of the acquisition in the Beazley Policy, which contradicts the clear intent Beazley suggests exists for the Exclusion

---

[124] *Id.* Ex. 5–6.
[125] *Id.* Ex. 7; Ruisinger Aff. ¶¶ 16–17.

31

to apply only to the acquisition. Plaintiffs make the case that if Beazley's interpretation governs, then the Retroactive Date Exclusion also applies to other Insureds—such as FGP—who were not specifically named therein. Plaintiffs reason that Beazley's interpretation would render the specificity of Bridger Logistics in the Retroactive Date Exclusion meaningless and disregard the plain language. Plaintiffs contend that Beazley's interpretation violates the reasonable expectations of the Insured under the Beazley Policy.[126] Beazley's interpretation also broadly construes the Exclusion in favor of the drafter, Beazley, in direct contradiction to Delaware insurance contract interpretation principles.

The Court finds that the Retroactive Date Exclusion is clear and unambiguous. The provision applies "*solely* with respect to Bridger Logistics," an entity specifically included as an Insured.[127] A reasonable third party would interpret the Exclusion to apply solely with respect to coverage of that named Insured.

Although the Court finds no reasonable alternative interpretation,[128] even if ambiguity existed, the rules of construction require the Court to interpret the policy

---

[126] *Verizon* 2017 WL 1149118, at *8 (the reasonable expectations of the insured must be considered "to see if the policy terms are ambiguous or conflicting, contain a hidden trap or pitfall, or if the fine print takes away that which has been provided by the large print….").
[127] Jones Aff., Ex. 1, Beazley Policy, Endorsement #14, C.5.
[128] *See Wooten*, at 239 (Del. 1967).

32

in favor of Plaintiffs, the insured, because Beazley drafted the policy.[129] "Coverage language is interpreted broadly to protect the Insured's objectively reasonable expectations...."[130] Exclusions, on the other hand, are construed narrowly in favor of coverage.[131] Here, the interpretation that the Retroactive Date Exclusion applies only to Bridger Logistics as an entity seeking coverage maintains a narrow reading of an exclusion without rendering it meaningless.

The allegations in the FAC are not "solely" against Bridger.[132] Eddystone brought its action against Rios, Gamboa, Bridger, FGP, FG, and several Bridger Group entities,[133] and did not separate those its claims based on the roles Rios and Gamboa assumed at the time. Rios sought indemnity from FG for his defense of his conduct while he was acting in his capacity as an officer of FG and Ferrellgas, Inc.[134] The FAC alleges that the Transfer Acts began in May 2015.[135] Rios and Gamboa were Bridger directors and officers at that time.[136] As of June 24, 2016, Rios and Gamboa held simultaneous management roles with Bridger and Ferrellgas, and were sued in both capacities.[137]

---

[129] *Hallowell*, 443 A.2d at 926 (citing *Novellino v. Life Ins. Co. of North America*, 216 A.2d 420, 422 (Del. 1966); *Steigler v. Insurance Co. of North America*, 384 A.2d 398, 400 (Del. 1978)).
[130] *Med. Depot, Inc. v. RSUI Indemn. Co.*, 2016 WL 5539879, at *7 (Del. Super.).
[131] *Deakyne v. Selective Ins. Co. of Am.*, 728 A.2d 569, 574 (Del. Super. 1997).
[132] FAC ¶¶ 63–66
[133] *Id.* at 20–26.
[134] Jones Aff., Ex. 5.
[135] FAC ¶ 69.
[136] *Id.* ¶¶ 42–45.
[137] *Id.* ¶ 54.

The Court finds that the Retroactive Date Exclusion applies to claims *solely* with respect to Bridger Logistics. The Court also finds that the Retroactive Date Exclusion clearly and unambiguously excludes "solely with respect to Bridger Logistics...any Wrongful Act actually or allegedly committed or any conduct actually or allegedly undertaken prior to June 21, 2015."[138] Therefore, coverage applies to the alleged "Wrongful Acts" and any "Interrelated Wrongful Acts" committed on or after June 21, 2015 by Rios and Gamboa in their concurrent capacity as FG officers. Beazley's Motion for Summary Judgment is hereby **DENIED.** Plaintiffs' Motion for Partial Summary Judgment on Count II, advancement and reimbursement of defense costs pursuant to the Beazley Policy, is hereby **GRANTED**.

## CONCLUSION

The Court finds that the Run-Off Exclusion applies to the Transfer Acts alleged in the Eddystone Litigation. Additionally, the Eddystone Litigation did not pursue a Claim for the Inducement Acts. Thus, the Eddystone Litigation is excluded from the Zurich Policy coverage. Therefore, Zurich's Motion for Summary Judgment is hereby **GRANTED**, Count I is dismissed, and Plaintiffs' Motion for Partial Summary Judgment on Count I, duty to advance defense costs, is hereby **DENIED.**

---

[138] Jones Aff., Ex. 1, Beazley Policy, Endorsement #14, C.5.

The Court finds that the Retroactive Date Exclusion applies to claims *solely* with respect to Bridger Logistics. The Court also finds that the Retroactive Date Exclusion clearly and unambiguously excludes "solely with respect to Bridger Logistics…any Wrongful Act actually or allegedly committed or any conduct actually or allegedly undertaken prior to June 21, 2015."[139] Therefore, coverage applies to the alleged "Wrongful Acts" and any "Interrelated Wrongful Acts" committed on or after June 21, 2015 by Rios and Gamboa in their concurrent capacity as FG officers. Beazley's Motion for Summary Judgment is hereby **DENIED** and Plaintiffs' Motion for Partial Summary Judgment on Count II, advancement and reimbursement of defense costs pursuant to the Beazley Policy, is hereby **GRANTED.**

**IT IS SO ORDERED.**

The Hon. Mary M. Johnston

---

[139] Jones Aff., Ex. 1, Beazley Policy, Endorsement #14, C.5.